MANUFACTURING ADMINISTRATION AND MANAGEMENT SYSTEMS, INC., Plaintiff,

v.

ICT GROUP, INC., Precision Response Corporation, RMH Teleservices, Inc., Telespectrum Worldwide, Inc., Defendants.

Davox Corporation, Plaintiff,

v.

Manufacturing Administration and Management Systems, Inc., Defendant.

Civ.A. Nos. 98–6532, 98–5020.

United States District Court, E.D. New York.

Dec. 30, 2002.

Ronald J. Schutz, Ken R. Hall, Emmett J. McMahon, Robins, Kaplan, Miller & Cerisi, Minneapolis, MN, Michael S. Owen, Daniel J. Bourque, Cook, Little, Rosenblatt & Manson, P.L.L.C., Manchester, NH, for plaintiff.

Mark N. Mutterperl, Fulbright & Jaworski L.L.P., New York City, Richard M. Dahl, Dunkley, Bennett & Christensen, Minneapolis, MN, Arnold Rosenblatt, Daniel J. Bourque, Cook, Little, Rosenblatt & Manson, PLLC, Manchester, NH, David A. Orenstein, Parsinen, Kaplan, Levy, Rosberg & Gotlieb, Minneapolis, MN, for defendants.

### MEMORANDUM AND ORDER

YOUNG, District Judge.[1]

## I. INTRODUCTION

### A. Procedural Posture

This patent dispute concerns telemarketing equipment. The plaintiff, Manufacturing Administration and Management Services, Inc., ("Manufacturing") originally filed suit in the District of Minnesota against various named defendants, including ICT Group, Inc. (the "Telemarketers"). Manufacturing al-

leged that Telemarketers' equipment infringed Manufacturing's United States Patent No. 4600814. The Telemarketers filed an answer generally denying infringement. Manufacturing did not name the manufacturer of the Telemarketers' allegedly infringing equipment, Davox Corporation ("Davox"), in its suit, and Davox subsequently filed suit in the Eastern District of New York seeking a declaratory judgment of non-infringement. The claims were consolidated.

The parties moved for summary judgment, and this Court ruled on the motions during a hearing on November 21, 2002. While the Court denied the parties' motions for summary judgment on the issues of infringement and patent enforceability, the Court granted partial summary judgment in favor of Manufacturing on the issue of patent validity.

On July 10th, 2000, while this case was pending before Magistrate Judge E. Thomas Boyle, he ordered Manufacturing, over its objection, to produce certain documents from the files of one of its experts. *Davox Corporation v. Manufacturing Administration and Management Services, Inc.*, No. 98–5020 (E.D.N.Y. July 10, 2000) (order compelling discovery) ("July 10th Order"). Thereafter, Manufacturing requested a stay of the July 10th Order until the Court could rule on Manufacturing's objections. On July 18, 2000, Magistrate Judge Boyle granted the stay. Manufacturing now moves this Court to set aside the July 10th Order.

### B. Facts

In its response to discovery requests made by Davox and Precision Response Corporation, Manufacturing withheld eighty-six documents, invoking the attorney work product doctrine. *See* July 10th Order at 2. Some of the withheld documents were not prepared by an attorney, but were notes made by a telecommunications expert who was designated to testify. The expert's notes were based on conversations with Manufacturing counsel with respect to applicable legal principles. *Id.*

Manufacturing admits that its counsel communicated with its testifying expert, Ben-

---

edict Occhiogrosso ("Occhiogrosso"), about various legal concepts such as patent validity, prior art, infringement, patent interpretation, and legal defenses to patent infringement. Manufacturing's Mot. to Set Aside Order at 2. In an affidavit, however, Occhiogrosso swore that he "did not rely upon those legal theories in performing [his] technical analysis and consequently rendering [his] opinions in this case." *See* July 10th Order at 2.

On April 6, 2000, Davox moved to compel the withheld documents. Davox Opp. at 5. Magistrate Judge Boyle ordered Manufacturing to submit the documents in the privilege log to the court for an *in camera* inspection. *Id.* Notwithstanding Occhiogrosso's affidavit, Magistrate Judge Boyle found that Occhiogrosso had contradicted his affidavit in his deposition testimony. Occhiogrosso stated in his deposition that, (1) claim construction was an "integral" part of the infringement issue on which he had opined, and (2) the claim construction "was provided, in part, in a collaborative series of sessions" with [Manufacturing's] counsel. *See* July 10th Order at 3. Magistrate Judge Boyle further found that Occhiogrosso's expert report, which included a construction of pertinent patent terms, was initially prepared by Manufacturing's counsel and that the report had "incorporated counsel's construction of terms used" in the patent. *Id.* Based upon these findings, Magistrate Judge Boyle ordered production of the withheld documents.

### C. Federal Jurisdiction

This court has jurisdiction to hear the motion to set aside Magistrate Judge Boyle's order to compel discovery under Rule 72 of the Federal Rules of Civil Procedure. Fed.R.Civ.P. 72(a).

## II. DISCUSSION

### A. Standard of Review

■ Under the Federal Rules of Civil Procedure, a judge may modify or set aside any portion of a non-dispositive pretrial order by a Magistrate Judge if it is "clearly erroneous or contrary to law." Fed.R.Civ.P. 72(a); *accord Thomas E. Hoar, Inc. v. Sara Lee Corp.*, 900 F.2d 522, 525 (2d Cir.1990).

### B. The Federal Rules of Civil Procedure and the Work Product Doctrine

Rule 26 of the Federal Rules of Civil Procedure creates a significant tension by promoting liberal discovery and, concomitantly, protecting certain information and communications as attorney work product. Specifically, the rules require liberal discovery of the information a testifying expert utilizes in forming his opinion. Fed.R.Civ.P. 26(a)(2)(B). The rules, however, shield from discovery "documents and tangible things" prepared by a party's attorney in anticipation of litigation or for trial that contain the attorney's mental impressions, conclusions, opinions, or legal theories and strategies. Fed.R.Civ.P. 26(b)(3). The conflict manifests itself when, as in the instant case, an attorney communicates such impressions, opinions, and legal theories to that party's own expert witness, who will testify at trial. The issue presented is simply whether Rule 26 requires discovery of the substance of those communications, or, rather, secures the attorney's work product, notwithstanding communication of the work product to a testifying expert.

### 1. The Work Product Doctrine

The work product doctrine, as codified in Federal Rule 26(b)(3), embodies the general principles articulated in *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). In *Hickman*, the Supreme Court held that, while an attorney's mental impressions, opinions, and legal conclusions are not privileged, they are generally not discoverable in the ordinary course. 329 U.S. at 508, 511, 67 S.Ct. 385. The work product doctrine enunciated in *Hickman* promotes a healthy adversary system in which attorneys enjoy the privacy necessary for "proper preparation of a client's case" to serve "the interests of clients" and the "cause of justice." *Id.* at 511, 67 S.Ct. 385. Such "proper preparation" for trial "demands that [an attorney] assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference." *Id.* at 511, 67 S.Ct. 385. Fol-

lowing the contours of the *Hickman* decision, Rule 26 protects attorney work product by commanding that a party may obtain discovery of documents and tangible things prepared in anticipation of litigation or for trial. However, discovery is allowed, "only upon a showing [of] ... substantial need of the materials in preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means." Fed.R.Civ.P. 26(b)(3). This first sentence of the provision refers to "ordinary" work product. The second sentence of the provision further requires that the court "protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." *Id.* Courts often refer to this provision as "core" work product. *See, e.g., Magee v. The Paul Revere Life Ins. Co.*, 172 F.R.D. 627, 642–43 (E.D.N.Y.1997).

Because work product material is not privileged, it may well constitute admissible evidence if the party makes evidentiary use of its substance at trial. *See United States v. Nobles*, 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975). Precluding discovery of work product in such cases could inhibit cross-examination and stilt the truth-finding process, because, for example, the opposing party would be prevented from illustrating any inconsistencies between the proffered testimony and certain pretrial statements contained in the work product. Under these circumstances, the work product protection is "waived" and the work product is therefore discoverable. *Nobles*, 422 U.S. at 240, n. 14, 95 S.Ct. 2160 (stating that waiver occurs when an attorney "attempts to make testimonial use of [work product] materials," at which point "the normal rules of evidence come into play with respect to cross-examination and production of documents.")

### 2. Rule 26 and the 1993 Amendments to the Federal Rules

Prior to 1993, practitioners and scholars alike criticized the federal rules of discovery

and the corresponding case law because neither provided useful guidelines to determine whether particular information was discoverable. Michael E. Plunkett, *Discoverability of Attorney Work Product Reviewed by Expert Witnesses: Have the 1993 Revisions to the Federal Rules of Civil Procedure Changed Anything?*, 69 Temp. L.Rev. 451, 468 (1996). Some critics disparaged the case law for failing to allow full and complete discovery, while others charged that it failed to protect work product adequately. *Id.* In response to the criticism, the Rules were amended in December, 1993. *Id.* at 486–69. The primary purpose of the revisions to Rule 26 was to "accelerate the exchange of basic information about the case and to eliminate the paper work involved in requesting such information ...." Fed.R.Civ.P. 26 advisory committee's note (1993 amendments).

The most striking modifications affected the provisions respecting experts. Plunkett, *supra*, at 469. While the former Rule 26(b)(4) required an expert witness to answer interrogatories that requested the "substance of the facts and opinions to which the expert was expected to testify and a summary of the grounds for each opinion," *see id.* at 470, the amended Rule 26(a)(2) requires far greater disclosure, including that of "all opinions to be expressed and the basis and reasons therefor; [and] the data or other information *considered* by the witness in forming the opinions ...." Fed.R.Civ.P. 26(a)(2)(B) (emphasis added). Indeed, scholars have noted that the new Rules expanded discovery with respect to expert witnesses significantly. *See, e.g.,* Plunkett, *supra*, at 470.

### C. Discoverability of Work Product Disclosed to a Testifying Expert

The conflict between liberal discovery and the work product doctrine emerges acutely in the context of work product disclosed to testifying experts.[2] Currently, federal courts

---

**2.** Prior to the 1993 Amendments, a significant divergence of views under Rule 26 existed as to the question presented by this motion. One circuit court considered the issue and held that, under Rule 26(b) as it existed at that time, any opinion work product generated by an attorney

was protected from discovery, notwithstanding disclosure to an expert. *Bogosian v. Gulf Oil Corp.*, 738 F.2d 587, 595 (3d Cir.1984). Several district courts followed this decision. *See, e.g., Hamel v. General Motors Corp.*, 128 F.R.D. 281, 282–83 (D.Kan.1989); *North Carolina Elec.*

sharply disagree about whether a party must produce the mental impressions, opinions, or legal conclusions of its attorney when the attorney communicates those opinions to a testifying expert. One line of decisions has adopted a bright-line rule, maintaining that Rule 26 mandates disclosure of all information shared with a testifying expert, including the mental impressions and opinions of the attorney. *See, e.g., B.C.F. Oil Refining, Inc. v. Consol. Edison Co. of New York, Inc.,* 171 F.R.D. 57, 63 (S.D.N.Y.1997) (documents reviewed by plaintiff's expert and contained the mental impressions, opinions, and litigation strategies of plaintiff's attorneys were not protected by work product doctrine); *TV–3, Inc. v. Royal Ins. Co.,* 194 F.R.D. 585, 589 (S.D.Miss.2000) (correspondence between expert witnesses and counsel was discoverable, notwithstanding defendants' work product objection); *Simon Prop. Group L.P. v. mySimon, Inc.,* 194 F.R.D. 644, 647 (S.D.Ind. 2000) ("an intentional disclosure of opinion work-product to a testifying expert effectively waives the work-product privilege"); *Lamonds v. General Motors Corp.,* 180 F.R.D. 302, 305–06 (W.D.Va.1998) (when an attorney provides work product material to a retained expert to be considered in the formulation of the expert's opinion, the information is discoverable); *Musselman v. Phillips,* 176 F.R.D. 194, 198 (D.Md.1997) (work product doctrine did not protect materials furnished by counsel to testifying experts for purpose of forming expert opinion); *Karn v. Ingersoll–Rand,* 168 F.R.D. 633, 635–36 (N.D.Ind. 1996) (work product does not protect disclosures related to the subject matter of the litigation that are made by attorney to testifying experts); *Furniture World, Inc. v. D.A.V. Thrift Stores, Inc.,* 168 F.R.D. 61, 62 (D.N.M.1996) (plaintiff was entitled to discovery of documents that defendant's counsel furnished to defendant's expert who was expected to testify at trial, notwithstanding defendant's work product objection).

Other courts have ruled that "core attorney work product," comprising the mental impressions and opinions of the attorney, are

protected from discovery, notwithstanding communication of that information to a testifying expert. *See, e.g., Magee,* 172 F.R.D. at 642–43 (the scope of "data or other information" considered by expert that must be disclosed does not include "core attorney work product," which is protected and not discoverable regardless whether communicated to expert); *Krisa v. Equitable Life Assurance Soc'y,* 196 F.R.D. 254, 260 (M.D.Pa.2000) (disclosure of core work product to a testifying expert does not abrogate the protection accorded such information, and such information is not discoverable); *Nexxus Products Co. v. CVS New York, Inc.,* 188 F.R.D. 7, 8–9 (D.Mass.1999) ( the required disclosure of material relied on by an expert witness in connection with preparation of a report does not include core attorney work product considered by the expert); *Haworth, Inc. v. Herman Miller, Inc.,* 162 F.R.D. 289, 294–95 (W.D.Mich.1995) (core work product is not discoverable, notwithstanding disclosure of such material to a testifying expert); *All West Pet Supply Co. v. Hill's Pet Prod. Div.,* 152 F.R.D. 634, 638–39 (D.Kan.1993) (same).

The scholarly literature reflects a similar split in opinion. *Compare* Plunkett, *supra,* at 483 (stating that the Federal Rules, "when read in conjunction with the work product doctrine, ... dictate that attorney work product given to an expert is discoverable."); Lee Mickus, *Discovery of Work Product Disclosed to a Testifying Expert Under the 1993 Amendments to the Federal Rules of Civil Procedure,* 27 Creighton L.Rev. 773, 808 (1994) ("The conflict within Federal Rule 26 therefore should be resolved in favor of allowing discovery of work product materials disclosed to a testifying expert ...."); 8 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2016.2 (2d ed.2002) ("At least with respect to experts who testify at trial, the disclosure requirements of Rule 26(a)(2) ... were intended to pretermit further discussion and mandate disclosure despite privilege.") *with* Christa L. Klopfenstein, Note,

---

*Membership Corp. v. Carolina Power & Light Co.,* 108 F.R.D. 283, 286 (M.D.N.C.1985). Other cases, however, tried to balance the policies underlying the work product doctrine and liberal discovery in a case-specific fashion. *See, e.g., Occulto v. Adamar of New Jersey,* 125 F.R.D. 611, 615 (D.N.J.1989).

*Discoverability of Opinion Work Product Materials Provided to Testifying Experts,* 32 Ind. L.Rev. 481, 502–07 (1999) (work product materials provided to testifying experts should not be discoverable under Rule 26); Gregory P. Joseph, *Emerging Expert Issues Under the 1993 Disclosure Amendments to the Federal Rules of Civil Procedure,* 164 F.R.D. 97, 103–04 (1996) (mental impression communications between attorney and expert do not constitute "data or other information" under the Federal Rules); *cf.* Katherine A. Staton, Note, *Discovery of Attorney Work Product Reviewed by an Expert Witness,* 85 Colum. L.Rev. 812, 835 (1985) (writing, prior to the 1993 amendments, that courts should require a showing of substantial need and undue hardship before ordering production of attorney work product disclosed to an expert witness).

### 1. Interpreting Rule 26

■ Notwithstanding the disagreement in the courts and the literature, the text of Rule 26 mandates disclosure of work product given to a testifying expert. The Amended Rule 26 requires disclosure of "the data and other information *considered* by the [expert] witness in forming the [expert's] opinions." Fed.R.Civ.P. 26(a)(2)(B) (emphasis added). The 1993 amendments to the Rules eschewed the old language, which merely called for disclosure of the "substance" of the expert's testimony through interrogatories, in favor of more liberal discovery, because the results under the old construction were often "sketchy and vague." Fed.R.Civ.P. 26 advisory committee's note (1993 amendments). The word "considered" in the amended rule embraces this expanded notion of discovery and is much broader than, for example, "relied upon" or a like phrase that might call for more limited disclosure.[3] Rule 26, therefore, plainly requires disclosure of all information reviewed in the formulation of an expert's opinion, notwithstanding the weight of any actual or perceived impact of that information on the expert's ultimate position.[4] As the Advisory Committee stated, "litigants should no longer be able to argue that materials furnished to their experts to be used in forming their opinions—whether or not ultimately relied upon by the expert—are privileged or otherwise protected from disclosure when such persons are testifying or being deposed." Fed.R.Civ.P. Rule 26 advisory committee's note (1993 amendments). Hence, because the attorney's mental impressions and opinions constitute information "considered" by the expert once that information is shared, Rule 26 mandates disclosure of such work product.

Some commentators have suggested that the text of provision (a)(2) of Rule 26 does not encompass attorney work product. One such commentator argues that "data or other information" does not include the mental impressions or opinions of an attorney. Joseph, *supra,* at 103. Joseph argues that this language and the Advisory Committee's reference to "materials" suggests that only *factual* information must be disclosed and that the word "considered" is important only so far as it prevents parties from performing mental gymnastics to conclude that an expert did not *rely* upon certain *factual* material. *Id.*

Such arguments, however, overlook other textual clues in the provisions of Rule 26 that suggest core attorney work product is not protected, once shared with experts. Where the 1993 Amendments chose to protect certain information from liberalized disclosure under Rule 26, they did so explicitly. For example, in provision (a)(1)(C), the Rule requires the disclosure of information used in the construction of damage calculations, but explicitly exempts from disclosure materials that are privileged or otherwise protected. By contrast, in provision (a)(2)(B), the Rule requires disclosure of materials considered

---

**3.** Such an interpretation is also supported by the drafting history of the 1993 Amendments. The initial draft of the provision required the expert's report to set forth the data or information the expert *relied upon* in forming the opinion. Preliminary Draft of Proposed Amendments to the Federal Rules of Civil Procedure and the Federal Rules of Evidence, 137 F.R.D. 53, 89 (1991).

The Advisory Committee rejected the "relied upon" language in the final draft.

**4.** Thus, Mr. Occhiogrosso's statement in this case that he "did not rely" upon the information communicated to him by Manufacturing' counsel is irrelevant.

by the testifying expert in forming opinion, but includes no specific exemption for protected or privileged materials. *See* Plunkett, *supra*, at 477. Indeed, the exclusion of such language is consistent with the notion that the sharing of materials with an expert designated to testify establishes a waiver of any protection associated with the information, because sharing it with a testifying witness implicitly constitutes "testimonial use" of the work product, which, as the *Nobles* Court held, waives work product production. *Nobles*, 422 U.S. at 240 n. 14, 95 S.Ct. 2160. The work product doctrine, therefore, should not extend to these cases.

## 2. The Benefits of Mandatory Disclosure

In addition to the plain text of amended Rule 26, prudence counsels the mandatory disclosure of attorney work product communicated to a testifying expert. A bright-line approach (a) embraces the reality of attorney-expert dynamics within the litigation setting and promotes effective cross-examination; (b) does not eviscerate the work product doctrine; and (c) ensures the integrity and efficiency of the truth-finding process.

### a. The Physics of the Attorney–Expert Relationship and Promoting the Opportunity for Effective Cross–Examination

The modern attorney-expert relationship provides fertile ground for improper influence, and mandatory disclosure cleanses any canker of corruption that might infect expert opinions. The Heisenberg Uncertainty Principle, one of the most famous precepts in the scientific world, provides an apt analogy in this case. Heisenberg stated that "the more precisely a position is determined, the less precisely the momentum is known in this instant, and vice versa." Werner Heisen-

berg, *Uncertainty Paper*, 33 Zs. f. Phys. 172 (1927), *available at* htt p://www. aip.org/history/heisenberg/p08.htm. In other words, Heisenberg postulated that the very act of observing nature's fundamental particles altered their behavior.[5] Hence, a scientist's interaction with a subject creates an uncertainty about the effect of that interaction on the subject. *See* Laurence H. Tribe, *The Curvature of Constitutional Space: What Lawyers can Learn from Modern Physics*, 103 Harv. L.Rev. 1, 19 (1989) (the "observer is never really separate from the system being studied . . .").

Importing this learned principle into the world of litigation, an attorney's interaction with an expert engenders a similar uncertainty. First, an attorney controls the information flow to the expert and can, therefore, influence the expert's opinion through his decisions about what to disclose (such as his opinions and mental impressions about the case) and when to do so. Mickus, *supra*, at 788–89. Indeed, such influence can occur even absent the expert's awareness. An expert might well claim, in good faith, that he or she did not rely on any one piece of information furnished by the attorney, notwithstanding any actual prejudice that might have occurred. In addition, the ongoing employment relationship between attorney and expert may encumber expert objectivity. The attorney's communications with the expert might contain overt or covert suggestions about what the expert should conclude, and the financial incentives that inhere in a "sympathetic" opinion are undeniable. *Id.* These dynamics result in a distinct uncertainty respecting the body of information that an expert actually "considered" in forming his or her opinion. This uncertainty, in turn, can lead to incomplete discovery production, absent mandatory disclosure.

---

**5.** As Laurence Tribe noted, the Heisenberg Principle teaches, in more technical terms, that

[t]he position of the electron will be known with an accuracy given by the wave length of the gamma ray. The electron may have been practically at rest before the observation. But in the act of observation at least one light quantum of the gamma ray must have passed the microscope and must first have been deflected by the electron. Therefore, the electron has been pushed by the light quantum, it has

changed its momentum and its velocity, and one can show that the uncertainty of this change is just big enough to guarantee the validity of the uncertainty relations. Laurence H. Tribe, *The Curvature of Constitutional Space: What Lawyers can Learn from Modern Physics*, 103 Harv. L.Rev. 1, 18 n. 66 (1989), *citing* Werner Heisenberg, Physics and Philosophy: The Revolution of Modern Science 47–48 (1948).

The most important justification for instituting mandatory disclosure, therefore, is to promote effective cross-examination. Without pre-trial access to attorney-expert communications, opposing counsel may not be able to uncover and reveal effectively the influence that counsel has achieved over the expert's testimony. *B.C.F. Oil,* 171 F.R.D. at 66; *accord Musselman,* 176 F.R.D. at 198–99; *Karn,* 168 F.R.D. at 639; *but see Haworth,* 162 F.R.D. at 295–96 (stating that "[t]he risk of an attorney influencing the expert witness does not go unchecked in the adversarial system, for the reasonableness of an expert opinion can be judged against the knowledge of the expert's field and is always subject to the scrutiny of other experts"); Klopfenstein, *supra,* at 504 (arguing that disclosure of attorney work product is not required for effective cross-examination). As the *Karn* court explained, "the impact of expert witnesses on modern-day litigation cannot be overstated." *Karn,* 168 F.R.D. at 640. Given that attacking credibility through full and fair cross-examination is a "vitally important task in the usual, and increasingly frequent, 'battle of experts'," therefore, protecting communications between attorneys and experts significantly obstructs an important goal. *Id.* As one scholar stated:

> Admittedly, a strong attack on the merits of an expert's conclusions by itself substantially undermines the credibility of the expert ... [but] the additional showing that counsel manipulated the expert's analysis and ultimate findings pushes the expert's testimony from the realm of sloppy science into that of biased science.

Mickus, *supra,* at 792 n. 89. To be sure, the conflict between promoting full and fair cross-examination and protecting attorney work product presents the courts with a policy choice. The broad policy objective of liberal discovery in the Federal Rules and the centrality of effective cross-examination in the adversary system, however, should tip the scale in favor of disclosure of information relayed to an expert.

### b. Preserving the Foundation of the Work Product Doctrine

Furthermore, a mandatory disclosure rule does not eviscerate the work product doctrine. Encouraging unrestrained thinking and full investigation of various legal strategies justifies work product protection only with respect to the development of legal information. *Id.* at 785. Neither informing an expert about the factual aspects of the litigation, nor influencing or prompting an expert to adopt an opinion that favors the attorney's legal theory, promotes the creation of legal information. *Id.* In other words, disclosing opinion or "core" work product to an expert is unnecessary for the creation of legal information, and, thus, disclosure serves ends other than those for which work product protection exists. To escape the wide swath of discovery's net, therefore, an attorney can simply choose not to communicate such work product to a testifying expert. *See, e.g., Karn,* 168 F.R.D. at 639–40.

Some commentators argue that an attorney must be able to have free exchange with the expert because the expert is a valuable part of the "litigation team." Klopfenstein, *supra,* at 503. Such proponents contend that experts should enjoy uninhibited exchange with the attorney to aid in the analysis of the case and development of litigation strategy. *Id.* This argument, however, mischaracterizes the role of the expert in litigation to the extent it implies that testifying experts serve as party advocates. Mickus, *supra,* at 807. The expert exists to assist the judge or jury in findings of fact—not to act as an advocate from the witness stand. *Id.; accord* Fed. R.Evid. 702 (an expert may testify if his opinion "will assist the trier of fact to understand the evidence or to determine a fact in issue"). Therefore, mitigating the expert's role as an advocate is, in fact, desirable.

### c. Ensuring the Efficiency and Integrity of the Truth–Finding Process

Mandatory disclosure also encourages efficient fact-finding by the trial courts. A bright-line rule for disclosure eliminates the demands on courts to sift through voluminous documents to determine whether particular information is fact or opinion. *B.C.F. Oil,* 171 F.R.D. at 66. Furthermore, mandatory disclosure also aids the party whose attorney work product is in question, because the bright-line rule eradicates any "lingering

uncertainty" as to what documents will be disclosed. *Id.; Musselman,* 176 F.R.D. at 198; *Karn,* 168 F.R.D. at 641. These broad policy goals all speak highly in favor of mandatory disclosure.

### 3. The Costs of Mandatory Disclosure

Candidly, this Court recognizes that mandatory disclosure carries significant costs. Because mandatory disclosure creates the disincentive to share legal theories and opinions with a testifying expert, the bright line rule accordingly creates an incentive for a party additionally to retain a non-testifying expert, to whom an attorney may speak freely about litigation strategies and opinions without falling prey to the powerful jaws of mandatory disclosure.[6] Retaining both a non-testifying expert and a testifying expert, however, can increase a party's litigation costs significantly, thereby favoring flush litigants.

Despite this burden, this Court rules that effective cross-examination and the integrity of the fact-finding process outweigh the costs of retaining two experts. Modern-day litigation is an expensive proposition, and the reality of certain financial barriers is harsh, but basic equity in an adversarial system necessarily entails costs and all courts are bound by the creed of fairness. This Court is no exception.

### D. Federal Rule of Evidence 612

Others view the discord between the attorney work product doctrine and liberal discovery through a different analytic lens: the Federal Rules of Evidence. Some courts have interpreted Rule 612[7] to entitle an adverse party to discovery of documents reviewed by a testifying expert for the purposes of proper cross-examination. *See, e.g., Nutramax Laboratories, Inc. v. Twin Laboratories, Inc.,* 183 F.R.D. 458, 472 (D.Md. 1998). In such cases, the courts have ruled that Rule 612 serves as the basis for a waiver of work product protection. *Id.* At the same time, courts have been careful to limit work product protection waiver to cases in which the competing interests, on balance, weigh in favor of disclosure versus protection. *Id.* at 469–70 (identifying the competing interests as (1) status of the witness; (2) nature of the issue in dispute; (3) when the events took place; (4) when the documents were reviewed; (5) number of documents reviewed; (6) whether the witness prepared the documents; (7) whether the documents contain "pure" attorney work product; (8) whether documents were previously disclosed; and (9) whether credible concerns of manipulation, concealment, or destruction of evidence exist).

Generally, the concerns identified with respect to Rule 612 are identical to those concerns for effective cross-examination under the discovery rules, but full reliance on Rule 612 is misplaced. Rule 612 is supported by three rationales: (1) the need to test the accuracy of a witness's memory; (2) the need to test the refreshing document's power to evoke the memory about which the witness is testifying; and (3) the need to guard against improper prompting between attorney and witness. Staton, *supra,* at 831. The last rationale is the basis through which courts extrapolate a requirement to turn over work product shared with the witness. Rule 612 focuses narrowly on the need to prepare a witness for actual testimony at trial, whereas Rule 26 allows for production at any stage of the litigation, because an attorney's communications with the expert can have the effect of influencing the expert's opinion through the entire course of its formulation. *Id.* In this way, Rule 26 ensures the integrity of the truth-finding process throughout the entirety of a particular case, extending beyond the recollection and enunciation of the expert's opinion at trial covered by inspection under Rule 612. Mickus, *supra,* at 802; *cf.* Alfreda Robinson, *Duet or Duel: Federal Rule of*

---

**6.** Exchanges with non-testifying experts are generally protected from discovery by Federal Rule 26(b)(4)(B). Mickus, *supra,* at 807.

**7.** Rule 612 states, in pertinent part, that "[i]f a witness uses a writing to refresh memory for the purpose of testifying, either—(1) while testifying, or (2) before testifying, if the court in its discre-tion determines it is necessary in the interests of justice, an adverse party is entitled to have the writing produced at the hearing, to inspect it, to cross-examine the witness thereon, and to introduce in evidence those portions which relate to the testimony of the witness." Fed.R.Evid. 612.

*Evidence 612 and the Work Product Doctrine Codified in Civil Procedure Rule 26(B)(3),* 69 U. Cin. L.Rev. 197, 240–44 (2000) (concluding that Rule 612 and Rule 26 should be harmonized).

### E. Analysis of the Instant Case

█ Under the analysis outlined above, the Magistrate Judge's order was neither clearly erroneous nor contrary to law, notwithstanding the *Magee* decision in this District. Because it is undisputed that the information in controversy in this case involves core attorney work product, the question presented here is purely a question of law.

First, the *Magee* decision is not controlling authority because a district court need not defer to the holdings of other sister courts. *See, e.g., Firemen's Ins. Co. v. Keating,* 753 F.Supp. 1146, 1156 n. 10 (S.D.N.Y.1990); *Equal Employment Opportunity Comm. v. Pan American World Airways,* 576 F.Supp. 1530, 1535 (S.D.N.Y.1984). Here, this Court respectfully disagrees with the decision in *Magee.* Furthermore, it is undisputed that the law is unsettled on the issue, even within the Second Circuit. *Compare B.C.F. Oil,* 171 F.R.D. at 66 *with Magee,* 172 F.R.D. at 642–43. A Magistrate Judge's order simply cannot be contrary to law when the law itself is unsettled. Moreover, because this Court rules that Magistrate Judge Boyle's analysis and conclusions were objectively correct as matter of law, based on the above analysis, the order is not clearly erroneous.

### III. CONCLUSION

Accordingly, the Plaintiff's Rule 72(a) Motion to Set Aside Magistrate Judge's July 10, 2000 Order [Docket No. 149] is DENIED.

SO ORDERED.